am on the 220 non-stop to Dallas. You're not going to make it. That's the problem with going to San Antonio, going to Dallas or Houston, there's a lot of direct flights. There's only one direct flight to San Antonio, that's why I was giving him a hard time. I would maintain we have better lobbyists than you, sir. First of all, I do want to thank you for the honor of appearing, and this is a beautiful courtroom, and appearing before this panel, I appreciate it. My name is Mark Stanley, I'm from Dallas, and my co-counsel, Marty McClain, is with the Hagen Sperm and Firm from Seattle, Washington. And I plan to reverse the order of the briefs a little bit and first discuss the expert exclusions before we get into the choice of law issues. But first I just want to give you five sentences about the case. This appeal involves a tragic case where three folks who were going to sing at a church were burned to death after a car accident. There is no reason they should not have survived this car accident. The two passengers in the front seat safely evacuated the car. They saw and heard the three folks in the back seat screaming, fighting, trying to get out the back doors, trying to get out of the rear hatch, trying to get out of the car, as all of a sudden the car was engulfed in flames. They should have survived the accident like the passengers in the front seat did. The car then exploded, and the three in the back seat who survived the accident were burned to death. Our client, Henry Sims, left behind eight living kids and the daughter of a knife. We didn't sue either of the drivers. We filed suit in California against Kia for a product defect, and that was the tank, the tank itself. Judge McBride, the underlying district court judge, essentially issued three orders which were death penalty, not sanctions, but death penalty orders to our case, gutted our case. Our first one talked about striking Michael McCourt. Michael McCourt was our accident reconstructionist. This is his business. He reconstructs accidents and testifies routinely in courts across this country. If you look at his opinion, it's replete of the work. It talks extensively about the work that he did. The district court struck his opinion saying that the testimony regarding the downward tank displacement theory was unreliable and thus inadmissible for lack of reliance or insufficient facts or underlying data, and he actually went further and said it does not satisfy any, not any of the four parts of Rule 702 of the Federal Rules of Evidence. What they're saying, the defendants sought to exclude Mr. McCourt based on his differential diagnostic methodology. You've got a car that has been beat up, okay? It's hit this way, pushed this way, it hits a pole, goes this way, eventually it goes over and hits a yield sign. It knocks the yield sign over properly. The yield sign broke where it should have, and there was a little flange that holds the car. The car goes over it, and there's a gas tank which is thinner than this paper clip with no protection whatsoever, and the gas tank hits this flange. The gas erupts, the friction causes a fire, and there's an explosion. What Mr. McCourt found was there were only two ways for that to happen. Either the car was really low when it went down there as a result of whatever forces of the accident, what happened to the tires, what happened to the suspension, or whatever else. He tested everything. He plugged in all the police report data, all the photographs from the scene. He examined the car. He examined an exemplar of the car, but what he said basically was either the car went over it so low that it impacted this tank, or something else happened. The tank by itself, the car by itself is about six inches loaded, six inches clearance, maybe eight inches unloaded. The flange itself was three and a half inches high. Where's the gap? What he said was, I can't tell you everything that happened to that tank. The defendants tell us that sometimes it moves because of swelling, sometimes it moves because of inertia. It's not protected. It doesn't have a shield on it. It doesn't have straps on it. The car is totally burned up, but what I can tell you is by looking at 3D analysis and looking at all of the factors, this car did not go low enough to impact it. Something must have happened. It must have moved. So with his differential diagnosis, he was able to rule out that the car went too low, right? Exactly right. Now, they may dispute that. But doesn't the differential diagnosis also, I guess, presuppose that there were some things that you could rule in? Isn't that part of what a differential diagnosis does? Well, you might be able to do it. Yeah, if there was actual proof that something happened, you might be able to do it. In other words, you look at potential causes. And then you can rule some things out, right? Which I guess by inference means some things are still potential causes. But very generally, all he can say is, it didn't happen because the car went too low. He said there's only one other way it would have happened. He ruled it in, kind of like what you're saying. The Fifth Circuit had this case in the Pepitone case, if you recall. And what happened was, someone had an injection of some fluid in his knee, and the patient got salmonella. Now, the experts ruled out and ruled in, well, what are the possible ways they could have gotten salmonella? Environmental exposure, maybe on the syringe, maybe it wasn't sterile. Maybe the fluid had it. But ruled in all the possibilities that it could have happened. So maybe there were four possibilities, I don't know exactly in Pepitone. But they were able to- So you have a finite universe of potential causes. Exactly. And in this case, he said there was only two finite possibilities. Either the car went so low that it hit it, or something moved. Now, the dynamics, the car is totally burned up. He could see that the mounting clips were bent. So he knows that something, where the tank is bolted on there, they were bent. He knows from the defendants that their tank moves. It does move through dynamic force, through swelling, through other issues, there is some movement there. But there was something that caused it to happen. So in Pepitone, they eliminated all the other causes, and the experts said, I'm 99.9% sure, I'm not 100% sure, but I'm 99.9% sure that the fluid conveyed the salmonella. McCourt did basically the same thing. He says, I've ruled out everything, I don't think the car got low enough. They may have expert testimony that comes out, and a battle of the experts, and they may say our expert's full of it, and that he's just absolutely wrong. They can prove that it got low enough. OK, that's a battle of the experts. But his methodology, it's not junk science. Dalbert is to throw out junk science. It's not a death penalty case. He performed the same analysis that accident reconstructionists do every day, and presented that to the court and to us, saying this is what I believe happened, 3D graphics. We have the benefit now of computer modeling. This is what I believe happened. I can't see any scenario where, and even their expert agreed under the five scenarios that he presented, the car never got low enough. So he said, the only other option is somehow there was tank movement. He's not a defect guy. He's not talking about the defect on the tank. He's just telling the jury, this is how I reconstructed the accident. And I kind of like the Fifth Circuit's reminder to district court judges and to counsel in Pepitone. It says, it bears reminding that the court's role as gatekeeper under Dalbert is not intended to serve as a replacement for the adversary system. Rather, Dalbert makes clear that vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking a shaky but admissible testimony, evidence. Well, thus, while exercising its role as a gatekeeper, a trial court must take care not to transform a Dalbert hearing into trial on the merits. That's what happened to us. Our Dalbert hearing became a trial on the merits. We think the other stuff, I'm going to skip over quickly because I'm going to run out of time. I can't believe it goes so quick. No peer review we addressed. Basically, the bottom line with McCourt, the court and defense counsel disagree with his conclusions, not with his methodologies. We think that's in error, and we think that McCourt's opinion should be reinstated. I'd like to turn to Wallingford. Yes, sir. One quick question, if I might. What is your theory of the alternative design that would have prevented this accident? Beautiful. Thank you. That goes right into the next expert, Wallingford. We designated McCourt for reconstruction, but Wallingford for design defect, and it's very simple. I'm going to dummy it down. I had to dummy it down for me to make sure I understand it. He said what everybody else in the industry does, and what Kia did not do in this case, was either they put a shield, a metal or polyethylene shield, on the bottom of the car or straps. By the way, the 2014 plus Kia Soul has the straps. He says two things on that. On the shield, Ford even makes a shield for their Panther series for the police cars that can withstand, let's say the tank hits an object at 100 miles an hour, the shield will not break. It will not rupture, so the police will survive. This had no shield. This tank, as thick as this paper clip, hit that flange and poof. He says if there was a shield on this car, he believes if it hit that flange, it would have survived. It would not have ruptured. These guys would have been beat up, no doubt about it, but there would not have been a fire. They would not have died. They would have been able to get them with those jaws of life, get them out of the car, and they would have survived. That's very clear, but that got struck also. The judge got confused. Judge McBride said that Wallingford relied on McCourt saying that the tank had to have dropped, and that's simply not the case. First of all, nowhere in Wallingford's report is the word McCourt. It just doesn't go there. The judge got confused about this one sentence. Wallingford admittedly said, following the initial crash, the fuel tank deformed down some distance from the mounted position and was therefore closer to the roadway. Had a shield been in place, I believe a more probable than not basis, based on a reasonable degree of automotive engineering certainty, that ground clearance would not have been lessened and the road sign base would have been narrowly avoided. That's his point on the shield. Basically, what he's saying is, like a cast on an arm protects you, the shield would have kept it up there. Or straps, he says, he could have moved it up two and a half inches with straps. I'll come to the straps in a minute. So, Judge McBride cites that sentence, but then what he misses is the next one. However, even if the breakaway could not have been avoided, the breakaway base could not have been avoided through the use of a tank shield, in other words, it's going to hit the flange. Even if that happens, I still believe it would have prevented the fuel tank from rupturing. The breakaway T-base was very nearly missed impacting the fuel tank as it was with the sole passing over it. He says if you put the shield on it, it's not going to penetrate and leak gas. He also said, and again, he said that 95 plus percent, I'm making that number up, but basically the vast majority of cars in the United States currently have shields or straps, and this car did not have a shield or a strap. He said if he had straps on there, you could have raised the tank two and a half inches, so instead of having six inches, you would have had eight and a half inches clearance. He said, quite frankly, he could have rejiggered it and made it another inch and a half. They can debate that all they want. They can bring up other experts to say that's caca, but they can't say that he didn't do his analysis right. His analysis was every other car does this. This is a defect. It's a product defect. These people died. They shouldn't have died. This is tragic, and you shouldn't . . . I don't believe that the judge should have . . . That doesn't leave much time. . . . . . . To say you don't believe the judge should have struck him, and maybe if we were in trial court, we would have ruled, but the standard is abuse of discretion. Do you think that not allowing these two experts to testify met that standard of the judge abusing his discretion? It did, and actually, there's a case in the Fifth Circuit, Boca Negra versus McCourt. In this case, yes, he did a general order saying, I don't find that it meets anywhere A through 4 of Rule 702, and I find that I strike it because he relied on McCourt. Well, that's clearly erroneous. He did not rely on McCourt. Not one time did he cite anything to McCourt. He wasn't dependent on the accident reconstructionist report. He said, it doesn't matter to me, even if it hits the flange, if it's got a shield, or if it has the straps, we're not going to have death. And so it's clearly erroneous, and yes . . . So you're saying Wallingford specifically described which method he would have used to prevent this rupture? He said, you have a choice, either one. He said, straps or shield would have avoided it. So he never picked one? He's not . . . no, he didn't pick an exact one. He said, either straps or shields would have developed it. He took an exemplar of a Honda that was a very similar looking car. He said, look at this. They do a shield. That's exactly the kind of thing you could do in this. He didn't exactly say . . . he said, either one would have worked. So he did two. He didn't do one. So he did offer an opinion that either one would have prevented the rupture in this case? Yes, sir. He didn't choose one. He chose two. Okay? Real quick, I only have 17 seconds left. On choice of law, we do think California law should apply . . . it really gets down to this. It's one sentence. Does Texas have a greater interest in limiting the recovery of its citizens against California corporations versus California having a greater interest in policing its companies? If you look at all the cases that are cited in the briefs, everybody agrees California law applies. Everybody agrees we should look at the California Supreme Court. In every one of those cases, California said we reserve the right to police our own corporations. They say it's happenstance they're in California? It's happenstance that all the defendants I sued are in Delaware, but they are. They chose to be in California. They chose to make themselves subject to California law. All the cars come through California originally. We sued in California, and in every single case, the California court says, our defendant, our problem, we have the right to police them. Why should they get a better deal because the accident happened in Texas? Was the case in a 1404 transfer back to Texas, or how did that happen? It happened as a matter of convenience. We filed in California in the Central District. If I'm understanding your question right, they moved because all of the evidence they said was going to be here.  Yes, sir. Okay, so when you filed in California, you brought back with it the substantive law of California under 1404 and Barak, including its choice of law provisions. Correct. So we're filing California choice of law provisions. Nobody disagrees with that. It should be California choice of law. All right. Thank you, Your Honor. I'm sure we're on the same page. Thank you. Thank you. Mr. Lobin. May it please the court. Just briefly on choice of law, the district court correctly applied California's governmental interest test. This was a case with Texas plaintiffs, Texas witnesses, Texas crash, vehicle sold in Texas, dealership in Texas, vehicle advertised in Texas. There's really the cases I would encourage the court on, every case, whether they're cases that they've cited or ours on conflicts of law, I'll show you that when all these facts line up in favor of . . . In Texas law, that's material to this case. Oh, there are many, many differences that are material. Is there a particular issue of admissibility? Yes. As it affects these experts, the safer alternative design standards that their experts, their design expert didn't meet, that's all under Texas law. So it is a true conflict between the Texas and California, and the parties agree on that, but since there's really no connection or very little connection in the defendants is located in California, the conflicts of law analysis comes out in favor of applying Texas law. But the material in the sense that if you apply California law, you get one result, and if you apply Texas law, you get a different one, and that law didn't come with it in the transfer? Yes. In the court that transferred the case, the district court in California commented that as he indicted in the transfer order, it looks like this case is going to have a difference in having Texas law applied in his transfer order sending the case to Texas. But the stronger interest . . . the choice of law that's being applied here, to be clear, it's California choice of law. Correct. Absolutely. And so the district court, Judge McBride applied California law, a choice of law to the defense. It's a question of . . . that case could not . . . here is a case in which you simply had the plaintiff's experts who are saying that had the tank been designed, had it been done differently, then this would not have happened, and the defense had a different theory about that. Now, what this case goes off on is that the district court just rejects one set of experts. What is it about the quality, the nature of this differential diagnosis that he says is simply not enough? If you eliminate all plausible causes that you can come forward with, or arguably so, why is that a jury question? How do you determine that as a matter of law? It's actually Mr. McCourt, the expert, answers the question himself in his deposition, because the way the Fifth Circuit in Pipitone and the way there's the four differential diagnosis cases we submitted to the court as well in our briefs, the way they describe this analysis is . . . Well, I mean, this label we put on it, differential diagnosis, and . . . You can call it process of elimination. I won't get past the labels and what the demands . . . what do the experts say? The category of differential diagnosis I don't think can be dismissed as simply not scientifically based. It's a question of its effectiveness in a given situation. Every hospital admitting a differential diagnosis, that's a very basic principle. It's absolutely a valid methodology to use to come up with a conclusion and to . . . Why is this a jury case is what it really comes down to. Because he had to start with a plausible, possible hypothesis, and he didn't. He started with a . . . Sounds to me perfectly plausible. Who says it's not plausible? He does. He says, I didn't rule it in. I only ruled it out. He never ruled it in in the first place. That's his testimony. He admits, I didn't rule it in. His testimony is, I don't know how the tank moved. His testimony is that we asked him, do you have any physical evidence that the tank actually moved in the way . . . How could it have happened if it were not so? The entire car, as our experts explained, the wheels basically come off as a result of all these crash forces. You've lost your rear wheels off of your car, so the bottom of your tank is now riding almost against the ground. That's how you get two and a half to three inches of the front of the tank heading into this steel edge that's hanging three and a quarter inches above the ground. It's because the whole car has been smashed up in the crash, the rear wheels are broken off and it's now riding almost on its belly into the flange. In this case, the crash itself took both rear wheels off? Yes, absolutely. The problem for the plaintiff's reconstructionist is he doesn't know when the rear wheel came off because he leaves the rear wheel on in that moment of the sequence. He can't get the tank down. He's got his reconstruction wrong. I got my reconstruction wrong, what do I do? Maybe the tank moved. That's all that's supporting that theory is maybe the tank moved. There's no analysis. Those simulations, all the work that he described, all the simulations, they all simulate things that did not happen. They all simulate versions of the accident that didn't occur. There's no simulation of this tank moving. There's no test that shows the tank moving. He's asked, can you test it? In their reply brief on page 10, they double down, they say, we don't know how to test this tank theory. We can't do it. We don't know how to test it. We don't know how it happened. We don't know what the precise mechanism was. He didn't measure, didn't tell us how far did the tank move. For this other expert to come in and say, well, we're going to apply this alternative design and prevent this from happening, doesn't he need to know how the tank moved in order to prevent the tank from moving? How is he going to say a shield or a strap or moving the tank is going to prevent this if their first expert hasn't explained to him how did it happen? If his explanation is, I don't know, so I guess the tank moved, the district court was right to read that deposition testimony. If the tank had been shielded, it would have happened anyway. Absolutely. Absolutely. Why? Because the shield doesn't change where the tank is in space, right? You can't, you're not moving the tank just by putting a shield on it. So we put one of these shields on and that's another, that's testimony. In my mind, I want you to disavow it, that's good, I'm not, I'm not trying to understand it. If, when you say shield, that tells me that there's some kind of a metal plate or some sort of stuff that would be struck before the tank would be struck. Correct. In other words, it would enable the basically to slide up over or whatever, but not be penetrated. That's the theory. Well, no, a theory, that's the shield, but if you had a shield, why would that not, why would that not have been in this accident? Well, it's, you go to Wallingford's testimony himself, he's asked, if we just put a shield on there and we strike the tank at 23 miles per hour, will it stop this tank from being punctured? And his initial answer is no, it would not. A shield is not designed to stop an immovable object traveling at 23 miles per hour, slamming into the front of the tank. The shield is designed just to cause, to move up over it. Right. And so what, all we have is Mr. Wallingford's word. A shield, if it's being penetrated at 23 miles an hour, that shields it only if the car's not moving. Right. So what kind of a shield is that? Well, we don't know because it's just a concept. Well, my question goes back to, I thought the experts were offering an alternative design of a shield. And my question is, you counter that that would not have made any difference. And my, I'm trying to understand what the scientific explanation is, is why that would not be so. Well, we actually ran a test, Your Honor. It's in the record in the joint pretrial order. You had other tests contrary. The Kia did, yes. Kia took another piece of steel and wrapped it around the tank, strapped up the tank just as Wallingford had described in his report. This was a, this was a evidence that you would offer in that, in regard to this case. Yes, sir. So Wallingford admits in his— Well, that sounds like a jury trial to me. Well, Your Honor, the— That's normally what you expect. Defendants got a theory, a hypothesis, and they go out and, I've seen it with GM in these cases, the products cases, they go rebuild the whole thing and show you that it couldn't have happened that way. It's very persuasive. But the trial judge doesn't do it on an evidentiary, really. But in those other cases, the alternative design that was proffered is an existing design that's actually used in other vehicles? Oh, that's why I direct attention to Maxi Freightliner. The design and location of those tanks that was, that found to be defective was common to every over-the-road truck in the United States, and it resulted in a change of design. Right. Because there are alternatives. There are puncture—race cars, you hit at high speeds out there, and you don't see many of them burning anymore. Why? Because of the design of those tanks. Right. And we asked Mr. Wallingford if any other production vehicle in the world— I'm sorry? We asked Mr. Wallingford if any passenger car had this shield he's describing, and he said no, Your Honor. We asked him if any production car, any passenger car, had the increased ground clearance that they're claiming would make a difference, and he said no. We asked—so, we're not talking about, as they've argued— The evidence says that no other cars have a shield there. I thought he—I misunderstood counsel opposite of that. You understood him perfectly. He said that their shield is one that exists on other cars, but their expert doesn't say that. He says the opposite. Here's his testimony, Your Honor. He says—we asked him, can you identify any passenger car— Well, yeah, that's that particular expert. My question is, is there evidence in this record as to the effectiveness of a shield? Not for this crash, and that takes you to the Casey case. The what? The Casey v. Toyota case, Your Honor, where a panel of this court looked at another proposed alternative design in a Texas case that hadn't been tested for the particular issue. Just like none of these tanks, none of these shields that they're advocating have been This ground clearance has been tested for this crash. It's right on all fours with your Casey v. Toyota opinion, where the side airbag that was in question hadn't been tested for the forces in that crash. They haven't calculated the forces in this crash because they don't know what happened to this tank. Because the reconstruction is flawed, they didn't do the forces for the tank, they can't then calculate what type of alternative design would change it. We know the tank was penetrated. Oh, absolutely, yes. And what I was raising with you is what this record shows in the expert testimony that the tank would have been penetrated but for the designs that the plaintiffs proffered. It's, you know, at this stage of the case, there's no testimony that any of the alternative designs that have been proffered have been tested and proven to prevent this crash or to prevent a crash that's even like this. The Panther testimony Is that a necessary requirement under Texas law in order to go forward on a claim? They need to show that they had a tested, proven alternative design? They have to show that it's technologically and economically feasible and that it would have made a difference. And one of the ways they can get there is to show testing. Another way they can get there is to show it was actually implemented on another vehicle. But it's not my understanding that you have to, and that's why I mentioned back to the Freightliner, which is also an opinion of this Court, that it was, its feasibility is what they have to prove. It doesn't, the cost, it has not been done in the industry, does not prevent recovery on that. You know, maybe the entire industry is at fault, who knows? But you're suggesting that they failed here to show that anybody else had used this, okay? But my question is, under Texas law, I don't, not in my understanding, that necessarily is fatal. If you've got expert testimony that says this is the way that's economically feasible to do. Now, it's powerful evidence that other people are using it because it demonstrates almost on its face that it's economically and technologically feasible. But feasibility, economically and technologically, can be derived by expert testimony. Are we together on that? Absolutely. Okay. Now, good. Now, help me then with what this record shows that the basis of judgment by its opinion that this was not, that this was so deficient that it should not be allowed to go to the district court. The real issue, the crux of it is that the only support for the idea that one of these alternative designs would make a difference in this case is the words of Mr. Wallingford. It's the words of the expert. In other words, they haven't provided, the appellants in the record on this case haven't provided evidence to show, judge the district court, that one of these designs would actually make a difference beyond Mr. Wallingford saying it would make a difference. So one example is testing. You could show a test that shows it makes a difference. Well, that may be enough if he says it, if he has a basis for it. Right. It comes down to the, I assume he said that. He did. And so it all comes down to whether or not there is an adequate basis for that. Absolutely. That's a correct statement, Your Honor. And the only basis that he's given is, number one, I say it. Number two, some cars use shields and some cars use straps. And that's it. There's no test. There's no engineering analysis. There's no other expert in the field who says a shield that would have been applied could stop this immovable object. The Panther test that they described is a car-to-car test, two cars coming together. It's not the front of a fuel tank running into a flange that's down near the bottom of the roadway. They're simply, this is an engineering question that no one has answered other than Mr. Wallingford claiming that he's got a way to solve the problem. But that's all it is. It's just his claim that I can solve the problem. This court requires him to provide reliable evidence, reliable support for that opinion. And there's nothing beyond, I say it would work, and I say that other cars have straps and shields. But when he's questioned on, do any of these cars that have straps and shield have the alteration of the geometry of the fuel tank to move it actually closer to the occupants, which is presumably a problem because in the plaintiff's complaint they said it's dangerous to have the tank so close to the occupants, but he wants to move it even closer to them. Is there anyone else that does that? No. Is there anyone who's tested it to see if it works in this particular crash? No, he doesn't have a test. He only has his word to this court and to the district court that I say would make a difference. And he's supposed to have more than that under this court's precedent. He's supposed to have something, whether he points to another vehicle, such as in the Goodner versus Hyundai case where they pointed to, these other vehicles have the 45 degree reclining seat. So that's your alternative design. He's admitted in his deposition, no other vehicle has my shield. I have to go design it. And he concedes in his deposition, this must be tested before I can tell you it's valid. But he hasn't done the work. He hasn't done the testing. He says, well, we decided not to do the testing because it would cost money and we didn't think it would be worth it. He should have tested it. He admits that design needs to be tested. So when the district court is reviewing all this under an abuse of discretion standard and trying to decide if there is sufficient reliable evidence that this particular concept of a shield that he's proposed that doesn't exist on any vehicle would have made a difference in this crash without doing any engineering work, without doing any of the calculations that would have proven he's correct or at least given the court some objective evidence that he's correct beyond Wallingford says it, it's just not there. You did test it and it didn't work, is that what you're saying? We did a test, we took his initial report and it said just put a shield on the tank and strap it up and you can prevent this from happening. So we did that. We pulled all, you have to pull all the wheels off the car, you have to pull all the suspension components off the front of the car because there are suspension components hanging lower than the tank. I'm out of time, Your Honor, but I'll just answer your question. So you have to rip off all the protection that was around the tank to run the test and then you run the test and it slices the same three-inch tall hole right through the center of the tank, even with a piece of metal wrapped around the tank, even with straps, makes no difference for our test. But there's another variable there and that's what the shield is. Absolutely. But no one's got a shield the way he describes it in this case. He says, we ask him, who's got the shield that you've theorized would make a difference? I can't name a production vehicle that has it. Well, the racing industry has contributed a great deal to the knowledge of a... He didn't propose a racing industry shield. I understand that. You know, he could have said that. I got that. I understand that. He didn't talk about bladders, he didn't talk about... He threw all those out, but none of those are his alternative design. Okay. Thank you, Your Honors. First, if I might, let's get the law straight. They raised the Casey case because I believe Judge Graves was on that case. Subsequent to Casey, the Texas Supreme Court made it very clear what the rule is in Texas. And since that's what we're talking about, Texas law in this case, the Texas Supreme Texas law does not require a manufacturer to destroy the utility of his product in order to make it safe. A safer alternative design is one that would have prevented injury or significantly reduced the risk of injury, would not substantially impair the product's utility, and was economically and technologically feasible at the time. This design need not be actually built and tested. A plaintiff must only show that the alternative design was capable of being developed. That's what Judge Higginbotham was saying. In fact, Mr. Wallingford gave them six photos of cars where he said, this is an alternative design that I believe works. And before this court rules, I would encourage you to go back into the record and look at the Wallingford report. It is very clear when he talks about a safe alternative design that's been used for more than 50 years in the industry. This is not new. We've had Ford Pinto. We've had the GM side saddle pickup trucks. But that apparently was not the basis of Judge McBride's ruling. What exactly did he say? What Judge McBride said was that Wallingford relied on McCourt's ruling to show that the tank somehow dropped down and hit the flange. And he said, therefore, because he relied on that, I can't go ahead and allow it. And if I might. I had his, yeah, I have the order. In the Wallingford report, what he didn't do was go to the next paragraph. He did talk about the downward departure of the tank. But then he said, I don't really care how it got there. He says, if it had this shield, it would have prevented the eruption. The shield would have deflected. It would have bounced off of it, essentially. And what counsel said was incorrect. As we understand what Kia did, they didn't put a shield on their test. What they did was they doubled the thickness from 8 milliliters to 16 milliliters of the tank. And then tested it. The focus is really not so much on what Kia did. That's defensive. That's defensive and will go to a question as to whether they even had to put that defense on. Whether you have enough evidence on your own. So if you look at the Wallingford. But you didn't have any testing done. And my broad, rested opinion on the absence of independent testing on your behalf. I would disagree with that, sir. He didn't rest on the absence of testing. What he said was Wallingford, it's a domino theory. If Wallingford is based on McCourt, you don't get Wallingford. I've struck McCourt. And where he was wrong was he didn't go further in the next paragraph in Wallingford's report that says, I don't really care. First of all, Wallingford never said McCourt. I saw in the briefs his recitation like a water plate and all. But I was trying to get at what exactly his basis was, Judge McBride's. So what Judge McBride said, and he was very specific in his order. He said Wallingford relied on McCourt, and it's this downward displacement theory. And if you're going to rely on this downward displacement theory, I'm going to strike you. And what he missed was, and maybe I'm not making myself clear, what he missed was Wallingford says, I don't care about the downward displacement. He says, replete in his report, I don't care how it happened, how it impacted. If there was a shield on there that's been used in the industry for more than 50 years that all these other manufacturers use, if there was a shield in there, it would not have penetrated the tank, and it would not have had an eruption. And look at the report. It's really, really clear. And in his testimony, he's very, very clear in there. Talked about that. I do want to say this one thing just earlier. I know we shouldn't address every issue. This issue of the wheels coming out, again, it's a battle of the experts. Our experts say the wheels did not come off the car. The police detective, Gorey, will say the wheels did not come off the car. It's a battle of the experts. What they're really fighting are conclusions, not our methodologies. And finally, I want to end on this issue that we raised earlier about Pepitone on the rule in, rule out issue. In Pepitone, the court says, Dr. Coco methodically eliminated the alternative sources of the infection as viable possibilities. After doing so, he stated he was 99.9% sure that the source of the salmonella was the syringe. He says, I have no evidence that it was a syringe, but I'm 99% sure. And what McCourt says here is, and he did rule in, said there are only two possibilities. The car got lower, or somehow the tank moved. I have no evidence that the tank moved, except for the bolting and the fact that Kia says that it sags and it moves during operation, because this car, I mean, this was a small component in a very dynamic crash. But he says, that's the only two ways this happened. You could see where it struck the tank. He said, I believe that, based on my experience as an accident reconstructionist, I think the jury should have the benefit of my wisdom that I believe that's. I have enough evidence that a reasonable jury could conclude that it is more probable than not that this was effective in the course of a producing cause. Yes, sir. Thank you, sir. Okay, thank you all. Have a safe.